ROBERT S. NAPOLETANO ET AL. *v.* CIGNA
HEALTHCARE OF CONNECTICUT, INC.
(15282)
F. BARRETT HOLLIS ET AL. *v.* CIGNA HEALTHCARE
OF CONNECTICUT, INC.
(15283)

Peters, C. J., and Callahan, Berdon, Katz and Palmer, Js.

Argued March 28—officially released July 23, 1996

*William J. Sweeney, Jr.*, with whom, on the brief, was *David M. Fisher*, for the appellants (plaintiffs in each case).

*Theodore J. Tucci*, with whom, on the brief, were *James A. Wade* and *Craig A. Raabe*, for the appellee (defendant in both cases).

*Richard Blumenthal*, attorney general, and *Richard J. Lynch* and *Thomas J. Ring*, assistant attorneys general, filed a brief for the state commissioner of health care access as amicus curiae.

*Lissa J. Paris, Elizabeth J. Stewart* and *Jeffrey S. Brody* filed a brief for the Connecticut Business and Industry Association as amicus curiae.

*Michael D. Neubert* and *Peter T. Fay* filed a brief for the Connecticut State Medical Society et al. as amici curiae.

KATZ, J. These cases require us to consider primarily whether an action for misrepresentation and for viola-

tions of the Connecticut Unfair Trade Practices Act (CUTPA) pursuant to General Statutes § 42-110b,[1] the Connecticut Unfair Insurance Practices Act (CUIPA) pursuant to General Statutes § 38a-816[2] and No. 94-235 of the 1994 Public Acts (P.A. 94-235),[3] as alleged by the

[1] General Statutes § 42-110b provides: "Unfair trade practices prohibited. Legislative intent. (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

"(b) It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 USC 45 [a] [1]), as from time to time amended.

"(c) The commissioner may, in accordance with chapter 54, establish by regulation acts, practices or methods which shall be deemed to be unfair or deceptive in violation of subsection (a) of this section. Such regulations shall not be inconsistent with the rules, regulations and decisions of the federal trade commission and the federal courts in interpreting the provisions of the Federal Trade Commission Act.

"(d) It is the intention of the legislature that this chapter be remedial and be so construed."

[2] General Statutes § 38a-816 provides in relevant part: "Unfair practices defined. The following are defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:

"(1) Misrepresentations and false advertising of insurance policies. Making, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison which: (a) Misrepresents the benefits, advantages, conditions or terms of any insurance policy; (b) misrepresents the dividends or share of the surplus to be received, on any insurance policy; (c) makes any false or misleading statements as to the dividends or share of surplus previously paid on any insurance policy; (d) is misleading or is a misrepresentation as to the financial condition of any person, or as to the legal reserve system upon which any life insurer operates; (e) uses any name or title of any insurance policy or class of insurance policies misrepresenting the true nature thereof; (f) is a misrepresentation for the purpose of inducing or tending to induce to the lapse, forfeiture, exchange, conversion or surrender of any insurance policy; (g) is a misrepresentation for the purpose of effecting a pledge or assignment of or effecting a loan against any insurance policy; or (h) misrepresents any insurance policy as being shares of stock."

[3] Number 94-235·of the 1994 Public Acts provides in relevant part: "An Act Concerning Managed Care. . . .

"(b) All preferred provider networks shall file with the commission on hospitals and health care prior to the start of enrolment. Any preferred

plaintiffs in *Hollis* v. *CIGNA Healthcare of Connecticut, Inc.*, and whether an action for breach of contract,

provider network existing as of October 1, 1993, shall file within sixty days of said date. All networks shall annually update said filing by July first commencing July 1, 1994. The filing required by such network shall include the following information, except where such information is filed with the insurance department . . . (2) A general description of the preferred provider network, including its geographical service area, the names of the hospitals included in the network and the names listed by specialty, of the providers included in the network . . . .

"(e) (1) Each preferred provider network shall file with the commission on hospitals and health care and make available upon request from a provider, the general criteria for its selection or termination of health care providers. Disclosure shall not be required of criteria deemed by the network to be of a proprietary or competitive nature that would hurt the network's ability to compete or to manage health services. For purposes of this section, disclosure of criteria is proprietary or anticompetitive if it has the tendency to cause health care providers to alter their practice pattern in a manner that would circumvent efforts to contain health care costs and is proprietary if revealing criteria would cause the network's competitors to obtain valuable business information.

"(2) If a network uses criteria that has not been filed pursuant to subdivision (1) of this subsection to judge the quality and cost-effectiveness of a health care provider's practice under any specific program within the network, the network may not reject or terminate the provider participating in that program based upon such criteria until the provider has been informed of the criteria that his practice fails to meet."

Public Act 94-235 (a) (3) defines "preferred provider network" as "an arrangement in which agreements relating to the health care services to be rendered by providers, including the amounts to be paid to the providers for such services, are entered into between such providers and a person who establishes, operates, maintains or underwrites the arrangement, in whole or in part, and shall include any provider-sponsored preferred provider network or independent practice association that offers network services. A preferred provider network shall not include a workers' compensation preferred provider organization established pursuant to Section 31-279-10 of the regulations of Connecticut state agencies or an arrangement relating only to health care services offered by providers to individuals covered under self-insured Employee Welfare Benefit Plans established pursuant to the federal Employee Retirement Income Security Act of 1974 as from time to time amended."

Public Act 94-235 (a) (4) defines "provider" as "an individual or entity duly licensed or legally authorized to provide health care services."

We note that P.A. 94-235 has been codified at General Statutes § 19a-166b. Because the parties refer to the Public Act rather than the statute, we do the same for purposes of consistency.

breach of an implied covenant of good faith and fair dealing, tortious interference with business expectancies and violations of CUTPA and P.A. 94-235, as alleged by the plaintiffs in *Napoletano* v. *CIGNA Healthcare of Connecticut, Inc.*, are preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.

The plaintiffs in *Hollis* are patients who had commenced treatment with the plaintiff physicians in *Napoletano*. These physicians participated in the health care network offered by the defendant, CIGNA Healthcare of Connecticut, Inc. (CIGNA). After medical treatment had begun, and although the plaintiff patients had been provided with various assurances that their physicians, who met CIGNA's credentialing standards, would continue to participate in their health care plans, the plaintiff physicians were unilaterally terminated from the network.

Specifically, the nine plaintiffs in *Hollis* filed a thirty-six count complaint. F. Barrett Hollis, typical of the eight other plaintiffs,[4] alleged that he had commenced medical treatment with a physician who participated in CIGNA's health care providers network and who was subsequently unilaterally removed by CIGNA from its list of participating physicians. Specifically, Hollis alleged that several months after his treatment for cancer had begun, CIGNA sent him a letter announcing

[4] The causes of action of the remaining eight plaintiffs are substantially similar. Each plaintiff, either through his or her own employment or that of a spouse, was a participant in a CIGNA health plan. Each received treatment from a physician who, at the time treatment commenced, participated in CIGNA's health care network. Thereafter, according to the allegations by each plaintiff, CIGNA removed the physicians treating each of the plaintiffs and engaged in a course of conduct that was substantially similar to what Hollis has alleged.

The other plaintiffs in the *Hollis* case are Vinetta Hollis, Elaine Arnett, Ellen Gentile, Darlene Chiloyan, Margaret Cooper, Richard Johnson, Sharon Johnson and Don Ludwinowicz.

changes to its network that CIGNA said would help it to achieve its goal of establishing a "comprehensive network of quality doctors who meet [its] credentialing standards . . . ." Because his doctor satisfied CIGNA's criteria but was nevertheless removed from its list, Hollis alleged that this letter misrepresented the credentialing standards. Three months later, CIGNA sent Hollis a second letter stating that should his doctor choose not to reenroll in its plan, Hollis' care would be transferred to another participating provider. According to Hollis, because his physician's removal from the network had been unilateral, this letter was also false. CIGNA then placed an advertisement in the Hartford Courant misrepresenting which physicians had been allowed to file applications to reenroll in CIGNA's network. The advertisement contained the name of Hollis' physician. Additionally, CIGNA sent Hollis a directory of providers, which included his physician, but failed to inform enrollees in its plan that participating physicians could be removed from the list without notice. On the basis of these alleged unfair and deceptive acts of misrepresentation and false advertising, Hollis alleged that CIGNA violated CUTPA and CUIPA.[5] Additionally, Hollis alleged that CIGNA had violated P.A. 94-235 by removing his physician from its provider network without advising Hollis of its criteria for removal and despite

---

[5] Although it appears from the amended complaint in *Hollis* that the plaintiffs are bringing separate causes of action under CUTPA and CUIPA, they explain in their brief and in their reply brief to this court that their "CUIPA [counts] . . . are incorporated in [their] CUTPA counts." This is the same response they offered to CIGNA's motion to strike, in which CIGNA claimed that there is no private cause of action under CUIPA independent of CUTPA. The trial court never addressed this claim in its memorandum of decision, concluding instead that all of the plaintiffs' claims were preempted by ERISA. In light of the plaintiffs' description of their claims, we need not resolve CIGNA's claim that there is no independent private cause of action under CUIPA. See *Lees* v. *Middlesex Ins. Co.*, 229 Conn. 842, 847 n.4, 850 n.10, 643 A.2d 1282 (1994) (this court declined to consider defendant's claim that CUIPA does not create private cause of action where CUTPA and CUIPA claims not independent).

having listed his physician as a CIGNA provider with the commission on hospitals and health care (commission). Finally, Hollis alleged that CIGNA had committed acts of misrepresentation by removing Hollis' physician from its provider network even though, in the material it had filed with the commission, CIGNA had listed his physician's name and had failed to indicate that it could remove him without notice.

In his demand for relief as to the alleged violations of CUTPA, CUIPA and the allegation of misrepresentation, Hollis sought "[m]onetary damages in excess of $15,000.00 exclusive of interest and costs," "[s]uch other equitable relief as the Court deems necessary and proper," and, with respect to the CUTPA and misrepresentation counts, punitive damages pursuant to General Statutes § 42-110g (a) and reasonable attorney's fees pursuant to § 42-110g (d). As to the alleged violation of P.A. 94-235, Hollis sought a declaratory judgment to determine whether CIGNA had violated P.A. 94-235. He requested that his physician be reinstated as a participant in CIGNA's health care plan. Finally, Hollis sought such other equitable relief as the court deemed appropriate.

The nine plaintiffs in *Napoletano* were the physicians who had treated the plaintiffs in *Hollis*.[6] In a forty-five count complaint, each plaintiff alleged that he was a physician licensed to practice in Connecticut, that he had been a participating physician in the CIGNA health care network, having contracted with CIGNA through Pro Care Independent Practice Association, Inc. (Pro Care),[7] but that, despite satisfying all of CIGNA's cre-

---

[6] The other plaintiffs in the *Napoletano* case are Jeffrey Steckler, Terrence K. Donahue, Robert Cosentino, Raphael Cooper, Paul Ceplenski, Ijaz Shafi, David Bass, and David Belman, all of whom are physicians.

[7] CIGNA contracted with Pro Care to create a preferred provider network through which services to employee benefit plans would be provided. Public Act 94-235 (a) (3) defines "preferred provider network." See footnote 3.

dentialing standards, he had been unilaterally terminated without just cause. Each plaintiff also alleged that although he continues to be board certified in his area of specialty and continues to satisfy CIGNA's credentialing standards, he has been denied the opportunity to reenroll as a participating physician in the CIGNA network. Additionally, the complaint alleges that CIGNA had misrepresented to the plan beneficiaries, as well as to each plaintiff, that each plaintiff would remain in its directory of providers throughout the length of CIGNA's annual contract with the patient, that each plaintiff would have the choice whether to reenroll, and that it would be the decision of each plaintiff whether to reenroll. In light of this alleged conduct by CIGNA, the plaintiffs claim that CIGNA breached its contract with each plaintiff, breached its obligation to deal in a manner consistent with good faith and fair dealing, tortiously interfered with each plaintiff's business expectancies, and violated CUTPA. Finally, by removing each plaintiff from CIGNA's plan while being listed as a provider in CIGNA's filing with the commission as mandated by P.A. 94-235, by failing to include in that filing the name and address of the person to whom the physicians could apply for participation in the network, and by rejecting each plaintiff without advising him of the criteria employed, CIGNA allegedly violated P.A. 94-235.

In connection with the common law claims for breach of contract, breach of good faith and fair dealing and tortious interference with business expectancies, each plaintiff sought "[m]onetary damages in excess of $15,000.00 exclusive of interest and costs" and "[s]uch other equitable relief as the Court deems necessary and proper." For the CUTPA violation, each plaintiff requested monetary damages, punitive damages pursuant to § 42-110g (a), reasonable attorney's fees pursuant to § 42-110g (d) and such other equitable relief as is

appropriate. Each plaintiff also sought a declaratory judgment to determine whether CIGNA's actions constituted violations of P.A. 94-235, to compel CIGNA's compliance with the requirements of the act, to preclude each plaintiff's termination from the network based upon CIGNA's previous noncompliance with the act and such other equitable relief as is appropriate.

CIGNA moved to strike all counts of both the *Hollis* and *Napoletano* complaints, claiming that they were preempted by ERISA.[8] The trial court, in a consolidated memorandum of decision, agreed and accordingly, granted CIGNA's motions to strike.[9] The plaintiffs in both cases appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

I

Following the filing of briefs in this appeal, sua sponte, we ordered the parties to file supplemental briefs addressing the following question: "Did all interested persons have reasonable notice of this action as required by Practice Book § 390 (d)? If not, did the trial court have jurisdiction to consider [CIGNA's] motions to strike?"

Practice Book § 390 provides in relevant part that "[t]he court will not render declaratory judgments upon the complaint of any person . . . (d) unless all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof." This court has consistently required strict adherence to this rule. *Hopkins* v. *Pac*, 176 Conn. 318,

[8] Additionally, CIGNA claimed that there was no private cause of action under P.A. 94-235 and that, even if one were to exist, the plaintiffs had failed to state a claim under the act.

[9] The trial court concluded that ERISA preempts any action under P.A. 94-235 by assuming, without deciding, that a cause of action exists.

319, 407 A.2d 979 (1978). Failure to comply with § 390 (d) deprives the trial court of subject matter jurisdiction to render a declaratory judgment. *Serrani* v. *Board of Ethics*, 225 Conn. 305, 308, 622 A.2d 1009 (1993).

"This rule . . . is not merely a procedural regulation. It is in recognition and implementation of the basic principle that due process of law requires that the rights of no man shall be judicially determined without affording him a day in court and an opportunity to be heard. *Kolenberg* v. *Board of Education*, 206 Conn. 113, 124, 536 A.2d 577, cert. denied, 487 U.S. 1236, 108 S. Ct. 2903, 101 L. Ed. 2d 935 (1988), quoting *Benz* v. *Walker*, 154 Conn. 74, 77, 221 A.2d 841 (1966). It is the settled rule of this jurisdiction, if indeed it may not be called an established principle of general jurisprudence, that no court will proceed to the adjudication of a matter involving conflicting rights and interests, until all persons directly concerned in the event have been actually or constructively notified of the pendency of the proceeding, and given reasonable opportunity to appear and be heard. *Connecticut Ins. Guaranty Assn.* v. *Raymark Corporation*, [215 Conn. 224, 229, 575 A.2d 693 (1990)], quoting *Ackerman* v. *Union & New Haven Trust Co.*, 91 Conn. 500, 508, 100 A. 22 (1917)." (Internal quotation marks omitted.) *State* v. *Carey*, 222 Conn. 299, 308, 610 A.2d 1147 (1992), rev'd on other grounds, 228 Conn. 487, 636 A.2d 840 (1994). Consequently, all persons who have a direct interest in the subject matter of the action are required to be made parties or to have reasonable notice of the action, even if their presence is not necessary to a decision of the issues between the parties of record.[10] *Benz* v. *Walker*, supra, 78.

---

[10] Parties are considered "indispensable when they not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such condition that its final [disposition] may be . . . inconsistent with equity and good conscience." (Internal quotation marks omitted.) *Sturman* v. *Socha*, 191 Conn. 1, 6, 463 A.2d 527 (1983); accord *Stamford Ridgeway*

The arguments by all the parties urging this court to conclude that the trial court had jurisdiction and to reach the merits are persuasive. The parties first argue that the trial court had jurisdiction to decide the motion to strike without providing notice to any additional parties because the requirements of Practice Book § 390 (d) were never triggered. They contend that, because the court never reached the merits of the declaratory judgment claim, having concluded that the actions were preempted by ERISA, the court was not required to reach the question of whether all interested persons had been given notice. See *Bourdieu* v. *Pacific Western Oil Co.*, 299 U.S. 65, 70–71, 57 S. Ct. 51, 81 L. Ed. 42, reh. denied, 299 U.S. 622, 57 S. Ct. 228, 81 L. Ed. 458 (1936) (inquiry into status of absent parties where complaint fails to state cause of action unnecessary); *Calcote* v. *Texas Pacific Coal & Oil Co.*, 157 F.2d 216, 221 (5th Cir.), cert. denied, 329 U.S. 782, 67 S. Ct. 205, 91 L. Ed. 671 (1946) (inquiry into absence of indispensable parties wholly gratuitous where cause of action not stated in complaint). This distinction is significant because if we were to disagree with the trial court in this case on the issue of preemption, the plaintiffs could pursue further procedural efforts to cure any defect regarding the notice requirement on remand. See *Mannweiler* v. *LaFlamme*, 232 Conn. 27, 36, 653 A.2d 168

*Associates* v. *Board of Representatives*, 214 Conn. 407, 439, 572 A.2d 951 (1990). Indispensable parties must be joined because due process principles make it "essential that [such parties] be given notice and an opportunity to protect [their] interests by making [them] a party to the [action]." *Fong* v. *Planning & Zoning Board of Appeals*, 212 Conn. 628, 634, 563 A.2d 293 (1989). Necessary parties, in contrast, are those "[p]ersons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. . . . [B]ut if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties." (Internal quotation marks omitted.) *Sturman* v. *Socha*, supra, 6–7.

(1995) ("[u]nlike other jurisdictional defects implicating the trial court's subject matter jurisdiction . . . the bringing of a declaratory judgment action is not itself precluded by a failure to comply with the notice requirement" [internal quotation marks omitted]).[11]

All parties also argue that, even if the trial court had been required to determine whether § 390 (d) had been complied with, all persons interested in the subject matter of the case at the time of the motions to strike were parties to the action.[12] We conclude that all interested persons were parties to the action, and therefore find no jurisdictional defect.

In *Hollis*, each plaintiff allegedly was insured by CIGNA and was the patient of a physician who had been removed from the provider network. Each alleged misrepresentation by CIGNA and claimed damages resulting from the interruption of a particular course of treatment with his or her physician. The record does not indicate that there are other patients who could claim damages based upon similar circumstances. Similarly, in *Napoletano*, there is no indication that there

---

[11] Because we conclude, however, that all interested persons were parties in these cases, we need not address the claim that this issue is premature.

[12] CIGNA further argues that, even if there were additional interested persons beyond the parties involved in the case, those interested persons had notice of the action. This court has previously concluded that "[w]here [interested persons] are reasonably within the reach of process and are not so numerous that it would impose an unreasonable burden upon the plaintiff they should be made parties; but if they or some of them are not reasonably available for service or to summon them or all of them into the action would put upon the plaintiff a burden he ought not fairly to be asked to assume, the provision for reasonable notice applies." *Benz* v. *Walker*, supra, 154 Conn. 78. Such reasonable notice may be accomplished by an order for public notice. *Serrani* v. *Board of Ethics*, supra, 225 Conn. 309–10. CIGNA cites to a variety of newspapers, including the Hartford Courant, The Connecticut Post and The Herald, which contained commentary on these cases, in support of its argument that all interested persons had notice of this action. Because we conclude that all interested persons were parties, reliance on these articles is unnecessary.

are other physicians who treated patients enrolled in CIGNA's health care plan and who are no longer in the provider network. Accordingly, we agree that the actions in the present case are personal to the named parties and all persons with an interest in the subject matter have been named. Cf. *Mannweiler* v. *LaFlamme*, supra, 232 Conn. 33 (unnoticed lot owners were classic "indispensable parties" because resolution of issues regarding restrictive covenants and alleged common scheme of development was relevant to all deeds within development); *Connecticut Ins. Guaranty Assn.* v. *Raymark Corp.*, supra, 215 Conn. 228 (unnoticed persons with outstanding personal injury claims against named defendant or its predecessors were "interested parties" where subject matter of complaint was insurance policy issued by insolvent insurer of named defendant).[13]

## II

We next consider CIGNA's argument that the plaintiffs' claims in both *Hollis* and *Napoletano* are moot. As to *Napoletano* , CIGNA contends that even were this court to reverse the judgment of the trial court as to the breach of contract and covenant of good faith and fair dealing claims, the trial court could not provide the plaintiffs with any practical relief. CIGNA structured its relationship with the plaintiff physicians through Pro Care, an independent practice association that contracted with CIGNA to provide services to employee

---

[13] The plaintiffs argue that even if there are other potentially interested persons, the filing of amici curiae briefs on behalf of consumers, physicians and insurance companies, satisfy any concerns associated with § 390 (d) because, although they are not actual parties, the amici nevertheless fully participated in the briefing of the issues and were not "prejudiced nor otherwise adversely affected by not being joined as a party . . . ." *Hilton* v. *New Haven*, 233 Conn. 701, 724, 661 A.2d 973 (1995). Because we have concluded that all interested persons are parties to this case, we need not decide whether the circumstances of this case are unique within the meaning of *Hilton.* Id., 723–24.

benefit plans that CIGNA administered and of which each of the plaintiff physicians was a member. See footnote 7. The plaintiff physicians, consequently, were third party beneficiaries of this contract, which provided that it could be terminated at any time and, in fact, was terminated by CIGNA on September 8, 1994. Because the contract has lawfully expired, CIGNA claims that "it is impossible to judicially enforce rights to participate in a provider network under a contract that no longer exists." As to the alleged violations of P.A. 94-235, CIGNA asserts that the claims are moot because it has already complied with the act.[14]

Finally, in connection with the plaintiff physicians' tortious interference with business expectancies claim, CIGNA argues that the plaintiff physicians could not expect that a business relationship with a patient would exist beyond the expiration of the patient's health care benefits under CIGNA's health care coverage options. CIGNA claims that all of its health care options, through which employees receive health care benefits, are limited to twelve months and that CIGNA clearly had the right to change its provider network structure when it renewed its health care coverage options. Consequently, even if the plaintiff physicians were to prevail, the trial court could require CIGNA to include them in the provider network only for the remaining time that their patients had coverage benefits under the health care option chosen.

As to the plaintiffs in *Hollis*, CIGNA contends that the expiration of the annual health care coverage options for all the plaintiffs precludes the practical relief they seek. In specific, CIGNA argues that the court could not reinstate the plaintiffs' physicians in a health care plan that no longer exists. Additionally, CIGNA

[11] CIGNA made the requisite filing after the plaintiffs filed their amended complaints.

argues that because it exercised its right to change the structure of the provider network upon the renewal of its contracts with the plaintiffs' employers, and that these new contracts do not include the plaintiff physicians as providers, the plaintiffs' claims have evaporated. We disagree that the plaintiffs in both cases are unable to obtain practical relief should they prevail.

"Mootness implicates the court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Citations omitted; internal quotation marks omitted.) *Ayala* v. *Smith*, 236 Conn. 89, 93–94, 671 A.2d 345 (1996).

We dispose of CIGNA's mootness claims summarily. CIGNA focuses solely on the plaintiffs' claims in both cases for injunctive relief and all but ignores their claims for redress of injury for even the limited period it contends is in question.[15] Because each of the eighteen plaintiffs in the two cases sought far more than injunctive relief in the eighty-one counts and because each states a claim for redress for, among other things, fraudulent and deceptive behavior, which, if proven, would

[15] The plaintiffs in both cases dispute CIGNA's argument that the existence of new contracts terminates certain of their claims. Because we disagree with CIGNA's interpretation of our mootness doctrine, we need not resolve this issue.

entitle them to punitive damages and attorney's fees, their claims are not moot.[16]

## III

The next issue that we address, which is the central substantive issue in this case, involves whether the plaintiffs' claims in both *Hollis* and *Napoletano* are preempted by ERISA. Specifically, we consider whether ERISA preempts the plaintiffs' claims for misrepresentation and for violations of CUTPA, CUIPA and P.A. 94-235 in *Hollis*, and whether ERISA preempts the plaintiffs' claims for breach of contract, breach of an implied covenant of good faith and fair dealing, tortious interference with business expectancies and violations of CUTPA and P.A. 94-235 in *Napoletano*. We conclude that because the claims raised by the plaintiffs do not affect or prescribe the establishment, administration, regulation or maintenance of an employee benefit plan, but, rather, merely seek to enforce the plan that CIGNA has chosen to create and administer, the claims do not "relate to" employee benefit plans within the meaning of ERISA's preemption provision. Consequently, none of the plaintiffs' claims in the two cases is preempted.

In the present cases, the trial court, on motions to strike, concluded that the plaintiffs' claims relate to an ERISA plan because they both refer to and are connected with such a plan.[17] The claims "refer to" an ERISA plan because "references to the plan abound in the . . . amended complaint." Also, the claims are "connect[ed] with" a plan "because the plaintiffs chal-

[16] As stated previously, in *Hollis*, each of the nine plaintiffs asserted four causes of action, and sought injunctive relief in only one. In *Napoletano*, each of the nine plaintiffs asserted five causes of action, and sought injunctive relief in only one.

[17] The trial court first decided the CUIPA claim in *Hollis* and, thereafter, adopted the same reasoning to strike all of the remaining counts in both cases. In reaching its decision, the court presumed the existence of a private cause of action under P.A. 94-235. See part IV of this opinion.

lenge the *administration* of the plan in question." (Emphasis in original.) The court explained that "[t]he complaint . . . focuses on CIGNA's removal of certain physicians from its plan. This is, in essence, a complaint about plan *administration*. This is a core ERISA concern." (Emphasis in original.) Furthermore, the court reasoned that "[a]llowing state law actions like the one[s] here would subject plans and plan sponsors to burdens not unlike those that the preemption clause seeks to foreclose. It is entirely foreseeable that different state courts, construing a wide array of state statutory provisions and common law principles, might develop different substantive standards governing the circumstances under which health plans could remove physicians from their lists. This would . . . require the tailoring of plans . . . to the peculiarities of the law of each jurisdiction. Such an outcome is fundamentally at odds with the goal of uniformity that Congress sought to implement." (Internal quotation marks omitted.)

Our review of the trial court's decision is plenary. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 14, 664 A.2d 719 (1995). In this case, the trial court ruled on motions to strike. The function of a motion to strike is to test the legal sufficiency of a pleading; it admits all facts well pleaded. See Practice Book § 152. The role of the trial court was to examine the complaints, construed in favor of the plaintiffs, to determine whether the plaintiffs have

stated a legally sufficient cause of action. See *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 472, 427 A.2d 385 (1980). Because the trial court drew conclusions of law, and did not make findings of fact, our review is plenary.

Our review of the trial court's decisions leads us into the quagmire of ERISA law. ERISA is a "comprehensive regulation of employee welfare and pension benefit plans [that] extends to those that provide 'medical, surgical, or hospital care or benefits' for plan participants or their beneficiaries 'through the purchase of insurance or otherwise.' [Section 3 (1) of ERISA], 29 U.S.C. § 1002 (1). The federal statute does not go about protecting plan participants and their beneficiaries by requiring employers to provide any given set of minimum benefits, but instead controls the administration of benefit plans, see § 2 [of ERISA], 29 U.S.C. § 1001 (b), as by imposing reporting and disclosure mandates, §§ 101–111 [of ERISA], 29 U.S.C. §§ 1021–1031, participation and vesting requirements, §§ 201–211 [of ERISA], 29 U.S.C. §§ 1051–1061, funding standards, §§ 301–308 [of ERISA], 29 U.S.C §§ 1081–1086, and fiduciary responsibilities for plan administrators, §§ 401–414 [of ERISA], 29 U.S.C. §§ 1101–1114. It envisions administrative oversight, imposes criminal sanctions, and establishes a comprehensive civil enforcement scheme. [Sections 501–515 of ERISA], 29 U.S.C. §§ 1131–1145. It also preempts some state law. [Section 514 of ERISA], 29 U.S.C. § 1144." *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U.S. 645, 650–51, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995).

The preemption provision of ERISA, 29 U.S.C. § 1144 (a) (1994), preempts any state law that "may now or hereafter *relate to* any employee benefit plan . . . ."[18]

---

[18] Section 514 (a) of ERISA, codified at 29 U.S.C. § 1144 (a), provides in relevant part: "Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall super-

(Emphasis added.) A law that "relates to" a benefit plan and that also "regulates insurance" pursuant to 29 U.S.C. § 1144 (b) (2) (A) and (B) is, however, exempt from ERISA preemption.[19] Consequently, our resolution of this matter turns on whether the plaintiffs' claims "relate to" the employee benefit plans offered by CIGNA.[20]

We begin by construing the phrase "relate to" in accordance with the intent of Congress in enacting ERISA. "It is fundamental that statutory construction requires us to ascertain the intent of the legislature and to construe the statute in a manner that effectuates that intent. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation . . . . *Petco*

---

sede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003 (a) of this title and not exempt under section 1003 (b) of this title. This section shall take effect on January 1, 1975."

[19] Title 29 of the United States Code, § 1144 (b) (2) (A) provides: "Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."

Title 29 of the United States Code, § 1144 (b) (2) (B) provides: "Neither an employee benefit plan described in section 1003 (a) of this title, which is not exempt under section 1003 (b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies."

[20] The plaintiffs claimed at oral argument that the health care plans offered by CIGNA in this case are not "plans" within the meaning of ERISA. Although CIGNA disputes this claim, because the plaintiffs failed to preserve this argument below and failed to brief this claim, we decline to address it. See Practice Book § 4065; *State* v. *Zarick*, 227 Conn. 207, 221, 630 A.2d 565, cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993); *Liscio* v. *Liscio*, 204 Conn. 502, 507, 528 A.2d 1143 (1987).

*Insulation Co.* v. *Crystal*, 231 Conn. 315, 321, 649 A.2d 790 (1994). In order to determine the meaning of a statute, we must consider the statute as a whole when reconciling its separate parts in order to render a reasonable overall interpretation. *Broadley* v. *Board of Education*, 229 Conn. 1, 6, 639 A.2d 502 (1994); *Ganim* v. *Roberts*, 204 Conn. 760, 763, 529 A.2d 194 (1987)." (Internal quotation marks omitted.) *Murchison* v. *Civil Service Commission*, 234 Conn. 35, 45, 660 A.2d 850 (1995); accord *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, 236 Conn. 681, 688–89, 674 A.2d 1300 (1996); see *Oklahoma* v. *New Mexico*, 501 U.S. 221, 235 n.5, 111 S. Ct. 2281, 115 L. Ed. 2d 207 (1991) ("we repeatedly have looked to legislative history and other extrinsic material when required to interpret a statute which is ambiguous"); *Green* v. *Bock Laundry Machine Co.*, 490 U.S. 504, 509–11, 109 S. Ct. 1981, 104 L. Ed. 2d 557 (1989); *Pierce* v. *Underwood*, 487 U.S. 552, 564–65, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988); *Blum* v. *Stenson*, 465 U.S. 886, 896, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984).

Since ERISA was enacted, the United States Supreme Court has attempted to explain when a law "relates to" an employee benefit plan. Early Supreme Court cases provided an expansive interpretation of this term.[21] In a 1983 case dealing with ERISA preemption, the court, viewing ERISA's preemption language to be clear and relying on a dictionary definition of the term "relate," stated that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has *a connection with or reference to* such a plan. . . .

"In fact . . . Congress used the words 'relate to' in § 514 (a) in their broad sense. To interpret § 514 (a) to

---

[21] As will be discussed later in this opinion, the Supreme Court and lower federal courts have retreated from an expansive interpretation in more recent cases.

[preempt] only state laws specifically designed to affect employee benefit plans would be to ignore the remainder of § 514. It would have been unnecessary to exempt generally applicable state criminal statutes from [preemption] in § 514 (b), for example, if § 514 (a) applied only to state laws dealing specifically with ERISA plans.

"Nor, given the legislative history, can § 514 (a) be interpreted to [preempt] only state laws dealing with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility, and the like. The bill that became ERISA originally contained a limited [preemption] clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected these provisions in favor of the present language, and indicated that the section's [preemptive] scope was as broad as its language. See H.R. Conf. Rep. No. 93-1280, p. 383 (1974); S. Conf. Rep. No. 93-1090, p. 383 (1974). Statements by the bill's sponsors during the subsequent debates stressed the breadth of federal [preemption]. Representative [John] Dent, for example, stated: 'Finally, I wish to make note of what is to many the crowning achievement of this legislation, the reservation to Federal authority the sole power to regulate the field of employee benefit plans. With the preemption of the field, we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation.' 120 Cong. Rec. 29197 (1974). Senator [Harrison A.] Williams echoed these sentiments: 'It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof,

which have the force or effect of law.' Id., at 29933."
(Emphasis added.) *Shaw* v. *Delta Air Lines, Inc.*, 463
U.S. 85, 96–99, 103 S. Ct. 2890, 77 L. Ed. 2d 490 (1983).

"It is thus clear that ERISA's [preemption] provision
was prompted by recognition that employers establish-
ing and maintaining employee benefit plans are faced
with the task of coordinating complex administrative
activities. A patchwork scheme of regulation would
introduce considerable inefficiencies in benefit pro-
gram operation, which might lead those employers with
existing plans to reduce benefits, and those without
such plans to refrain from adopting them. [Preemption]
ensures that the administrative practices of a benefit
plan will be governed by only a single set of regulations.
See, e.g., H.R. Rep. No. 93-533, p. 12 (1973) ('[A] fidu-
ciary standard embodied in Federal legislation is con-
sidered desirable because it will bring a measure of
uniformity in an area where decisions under the same
set of facts may differ from state to state')." *Fort Halifax
Packing Co.* v. *Coyne*, 482 U.S. 1, 11, 107 S. Ct. 2211,
96 L. Ed. 2d 1 (1987).

The Supreme Court has further concluded that "a
state law may 'relate to' a benefit plan, and thereby be
[preempted], even if the law is not specifically designed
to affect such plans, or the effect is only indirect."
*Ingersoll-Rand Co.* v. *McClendon*, 498 U.S. 133, 139, 111
S. Ct. 478, 112 L. Ed. 2d 474 (1990). However, "[s]ome
state actions may affect employee benefit plans in too
tenuous, remote, or peripheral a manner to warrant a
finding that the law 'relates to' the plan." *Shaw* v. *Delta
Air Lines, Inc.*, supra, 463 U.S. 100 n.21. For example,
many laws of general applicability that function irre-
spective of the existence of an employee benefit plan
are not preempted because they are too remotely
related to the plan. See *District of Columbia* v. *Greater
Washington Board of Trade*, 506 U.S. 125, 130 n.1, 113
S. Ct. 580, 121 L. Ed. 2d 513 (1992); *Ingersoll-Rand*

*Co.* v. *McClendon,* supra, 139. Lastly, in cases "where federal law is said to bar state action in fields of traditional state regulation . . . [the court has] worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " (Citation omitted.) *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.,* supra, 514 U.S. 655.

With the exception of these limitations, the United States Supreme Court until recently has generally viewed ERISA's preemption provision broadly. In recent cases, however, the court has retreated from this expansive view.[22] In *Travelers Ins. Co.,* the court acknowledged that although "[t]he governing text of ERISA is clearly expansive . . . [i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes [preemption] would never run its course, for '[r]eally, universally, relations stop nowhere,' H. James, Roderick Hudson xli (New York ed., World's Classics 1980). But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against [preemption] out of the law whenever Congress speaks to the matter with generality." Id.

The Supreme Court in *Travelers Ins. Co.* described the types of cases that raise preemption concerns, focusing on those scenarios in which a state law imposes a substantive mandate on an employee benefit plan. Id., 657, 662; see *FMC Corp.* v. *Holliday,* 498 U.S. 52, 60, 111 S. Ct. 403, 112 L. Ed. 2d 356 (1990) (state law dictated structure of plan); *Metropolitan Life Ins.*

---

[22] There is a general consensus that, in *Travelers Ins. Co.,* the Supreme Court indicated a retreat from preemption. See, e.g., *Crull* v. *Gem Ins. Co.,* 58 F.3d 1386, 1391 n.3 (9th Cir. 1995) ("[*Travelers Ins. Co.*] may well signal the present Justices' unhappiness with the rather sweeping deregulatory effect that an expansive reading of the words 'relate to' has had").

*Co.* v. *Massachusetts*, 471 U.S. 724, 739, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985) (state law mandated coverage of mental health care benefits); *Shaw* v. *Delta Air Lines, Inc.*, supra, 463 U.S. 96–97 (state law mandated subject of plan's benefits). The court then contrasted those cases with the case then before it in which a New York statute imposed surcharges on hospital rates for patients whose commercial insurance coverage had been purchased by employee health care plans governed by ERISA. The court stated that "[a]n indirect economic influence . . . does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself . . . . Nor does the indirect influence of the surcharges preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one."[23] *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, supra, 514 U.S. 659–60. The court summarized its conclusion as follows: "[W]e do not hold today that ERISA [preempts] only direct regulation of ERISA plans, nor could we do that with fidelity to the views expressed in our prior opinions on the matter. See, e.g., [*Ingersoll-Rand Co.* v. *McClendon*, supra, 498 U.S. 139]; *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U.S. 41, 47–48, 107 S. Ct. [1549], 95 L. Ed. 2d 39 (1987); *Shaw* [v. *Delta Air Lines, Inc.*, supra, 98]. We acknowledge that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme

---

[23] Additionally, the court stated that "cost uniformity was almost certainly not an object of [preemption], just as laws with only an indirect economic effect on the relative costs of various health insurance packages in a given State are a far cry from those 'conflicting directives' from which Congress meant to insulate ERISA plans. . . . Such state laws leave plan administrators right where they would be in any case, with the responsibility to choose the best overall coverage for the money. . . . [Therefore,] such state laws do not bear the requisite 'connection with' ERISA plans to trigger [preemption]." (Citation omitted.) *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, supra, 514 U.S. 662.

of substantive coverage or effectively restrict its choice of insurers, and that such a state law might indeed be [preempted] under § 514. . . . [A law, however, that affects] only indirectly the relative prices of insurance policies, a result no different from myriad state laws in areas traditionally subject to local regulation, [is one] which Congress could not possibly have intended to eliminate." *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, supra, 668.

Since *Travelers Ins. Co.* was decided, various courts of appeals, including the Court of Appeals for the Second Circuit, have focused on the Supreme Court's primary concerns with respect to ERISA preemption and, consequently, have followed the lead of that court by limiting ERISA preemption to state action that demonstrably burdens ERISA plans. The Court of Appeals for the Sixth Circuit stated that "Congress sought to [preempt] state laws [or state claims] that have a *burdensome effect* on ERISA plans. When a state law [or claim] has such an effect on a covered plan, it is [preempted]; when it does not, it is not [preempted] even if it actually refers to ERISA. Interpreting 'relates to' as being concerned with state laws' significant effects on covered plans serves Congress's purpose in enacting ERISA, [namely,] to avoid encouraging 'employers with existing plans to reduce benefits, [or] those without such plans to refrain from adopting them.' " (Emphasis added.) *Thiokol Corp., Morton International, Inc.* v. *Roberts*, 76 F.3d 751, 757 (6th Cir. 1996). The court in *Roberts* noted that the *Shaw* court's definition of "relate to"—whether a law has a "connection with" or a "reference to" an ERISA plan—creates a formalistic analytical distinction. Id., 758. The court suggested, instead, that "both are simply approximations of the same test. Although in its ERISA [preemption] cases the Supreme Court analyzes state laws by first examining whether they refer to a covered plan and, if not, whether they

still have some connection with a covered plan, the two categories are not analytically distinct; rather, they are two related methods of determining the fundamental question in ERISA analysis: *whether the state law has an impermissible effect on a covered plan.*" (Emphasis added.) Id.

The Court of Appeals for the Seventh Circuit explained recently that a law or claim will interfere with the provisions or administration of ERISA plans if it "*dictate[s] what benefits employers may offer their employees [or] interfere[s] with the manner in which those benefits are provided.*" (Emphasis added.) *Safeco Life Ins. Co.* v. *Musser*, 65 F.3d 647, 653 (7th Cir. 1995). Additionally, the Court of Appeals for the Eighth Circuit examined a series of factors to determine whether ERISA preemption applies, including whether a law or claim involves the historic police powers of the state, whether a provision of the plan is negated, whether the relationships among the primary ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—are altered such that the structure of the plan is changed, and whether there is more than a tenuous or peripheral economic impact. *Boyle* v. *Anderson*, 68 F.3d 1093, 1099, 1102–1105 (8th Cir. 1995), cert. denied, U.S.   , 116 S. Ct. 1266, 134 L. Ed. 2d 214 (1996).

The Court of Appeals for the Second Circuit has also recently examined the ERISA preemption doctrine in light of *Travelers Ins. Co.* In five cases, the court has focused on the Supreme Court's concerns. Quoting from *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, supra, 514 U.S. 656–57, the court in *O'Shea* v. *First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 113 (2d Cir. 1995), focused on Congress' goal in enacting ERISA, namely, "to ensure that plans and plan sponsors would be subject to a *uniform body of benefits law . . . [and to prevent] the potential for conflict in substantive law . . .* requiring

the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." (Emphasis added; internal quotation marks omitted.) The court determined that a New York statute requiring death beneficiary designations to be in writing was preempted by ERISA because the statute affected key plan documents and "[h]ad Congress chosen to impose a signature requirement, it could have done so. To impose such a requirement in New York, but not elsewhere, would frustrate ERISA's goal of establishing a unified national system to safeguard retirement benefits." Id., 114; see *Greenblatt* v. *Delta Plumbing & Heating Corp.*, 68 F.3d 561, 574 (2d Cir. 1995) (primary purpose of ERISA preemption is " 'to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans' ").

In *NYS Health Maintenance Organization Conference* v. *Curiale*, 64 F.3d 794, 800 (2d Cir. 1995), the court focused first on whether the law in question makes "reference to" ERISA, in specific, whether it "mentions or alludes to ERISA plans, and if the law affects ERISA plans in some manner," such as by mandating or manipulating the contents of an insurer's benefits package. Accord *New England Health Care Employees Union* v. *Mount Sinai Hospital*, 65 F.3d 1024, 1032 (2d Cir. 1995). The court also focused on whether the law was impermissibly connected[24] with an ERISA plan by having " 'an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit.' " *NYS Health Maintenance Organization Conference* v.

---

[24] "[A] 'connection exists where a state statute prescribes either the type and amount of an employer's contributions to a plan . . . the rules and regulations under which the plan operates . . . or the nature and amount of the benefits provided thereunder . . . . ' " *NYS Health Maintenance Organization Conference* v. *Curiale*, supra, 64 F.3d 801, quoting *General Electric Co.* v. *New York State Dept. of Labor*, 891 F.2d 25, 29 (2d Cir. 1989), cert. denied, 496 U.S. 912, 110 S. Ct. 2603, 110 L. Ed. 2d 283 (1990).

*Curiale,* supra, 801. For this to occur, the court stated that the effect must be "sufficiently disruptive to ERISA plans to merit preemption." Id., 800 n.17. Additionally, the court, reiterating *Travelers Ins. Co.,* concluded that "without evidence . . . [of] 'such acute, albeit indirect, economic effects . . . as to force an ERISA plan to adopt a certain scheme of substantive coverage or to effectively restrict its choice of insurers,' . . . ERISA does not preempt . . . ." (Citation omitted.) *Connecticut Hospital Assn.* v. *Weltman,* 66 F.3d 413, 415 (2d Cir. 1995).

In the present cases, CIGNA argues that the claims asserted by the plaintiffs are preempted by ERISA because they "relate to" the health care plan that CIGNA administers in that they deal with the administration of the plan.[25] CIGNA asserts that, because the plaintiffs' CUTPA, CUIPA and common law claims are based upon CIGNA's decision to restructure the health care coverage that it offers such that certain physicians would no longer be a part of the new provider network, the plaintiffs are directly challenging the propriety of the administration of the plans. CIGNA claims that the connection between the plaintiffs' claims and the ERISA plans is exemplified by the nature of the relief sought, namely, an injunction requiring CIGNA to include the physician plaintiffs in its provider network. Similarly, CIGNA argues that, with respect to the plaintiffs' claims arising under P.A. 94-235, in seeking an order to require that CIGNA include the plaintiff physicians in its provider network, the claims relate directly to the administration of the plaintiffs' employee benefit plans. We disagree.

The essence of the plaintiffs' claims do not relate to the administration of employee benefit plans. The

---

[25] CIGNA concedes that the statutory and common law causes of action are not preempted per se.

claims and relief sought do not impermissibly affect the plans—they do not attempt to prescribe the substantive administrative aspects of a plan, such as a determination of an employee's eligibility, the nature and amount of employee benefits, the amount of an employer's contribution to a plan, and the rules and regulations under which the plan operates. See, e.g., *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, supra, 514 U.S. 664–65; *District of Columbia* v. *Greater Washington Board of Trade*, supra, 506 U.S. 130–33; *FMC Corp.* v. *Holliday*, supra, 498 U.S. 60; *Metropolitan Life Ins. Co.* v. *Massachusetts*, supra, 471 U.S. 739; *Shaw* v. *Delta Air Lines, Inc.*, supra, 463 U.S. 95–100; cf. *Connecticut Hospital Assn.* v. *Weltman*, supra, 66 F.3d 415; *NYS Health Maintenance Organization Conference* v. *Curiale*, supra, 64 F.3d 800–801. The plaintiffs' claims do not require the administrators to operate the plans differently, they do not force a plan to adopt a certain scheme of substantive coverage, they do not tell CIGNA what type of plan to adopt, what coverage to offer, or whom to cover. As the Connecticut State Medical Society and the American Medical Association argue in their amicus brief to this court, "[u]nder the Act, an insurer, such as CIGNA, can structure its plan . . . and administer it any way it chooses; it simply must disclose, to a limited extent, what the structure of the [preferred provider network] is (by listing the providers) and how it is determined (by listing the criteria). This is not a *substantive* requirement, or the type which ERISA sought to [preempt]." (Emphasis in original.)

Rather than affecting or prescribing the establishment, administration, regulation or maintenance of an employee benefit plan, the plaintiffs' claims merely turn on requiring CIGNA to enforce the benefit plan that it has already established and is maintaining.[26] The *Hollis*

---

[26] To the extent that a requirement that CIGNA enforce the plans as created imposes administrative costs and burdens upon the benefit plans,

plaintiffs' statutory and common law claims are based on CIGNA's alleged misrepresentations that their physicians chose not to continue as plan providers and that the physicians did not meet the requisite criteria. One of the alleged reasons that the *Hollis* plaintiffs became or remained members of this plan was because CIGNA had contracted with certain physicians, whose identities they knew based upon the filing that CIGNA was required to make under P.A. 94-235. The *Hollis* plaintiffs, therefore, could reasonably presume that as long as their physicians continued to meet the credentialing criteria and did not meet any of the reasons for discharge, that they would continue to be providers under the plan. Furthermore, even if P.A. 94-235 did not exist, the *Hollis* plaintiffs could reasonably expect that their physicians would continue to be providers under the plan for the duration of the physicians' contracts with CIGNA and would not be unilaterally terminated.

Similarly, the *Napoletano* plaintiffs' claims simply assert that CIGNA has failed to enforce the employee benefit plan that it administers. The *Napoletano* plaintiffs reasonably believed that they would continue to be providers under the plan as long as they met the criteria that P.A. 94-235 required that CIGNA provide or for the duration of their contracts. The *Napoletano* plaintiffs are merely asking that their relationship with CIGNA be managed in accordance with a specific filing that CIGNA has made with the state in which CIGNA was required to indicate the criteria by which it would select and could discharge providers, as well as in accordance with their one year contracts with CIGNA. This is not a case in which the *Napoletano* plaintiffs seek to force themselves into CIGNA's plan. CIGNA removed the physicians from its list of providers before

the Supreme Court has concluded that indirect costs and burdens do not result in preemption. See *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, supra, 514 U.S. 662.

their contracts had expired and without following the requirements of P.A. 94-235—it did not inform the plaintiff physicians of its criteria for discharge and did not give alternate reasons for discharging them. Neither class of plaintiffs is requesting that CIGNA change the method by which it determines which physicians will be providers under its plan—in other words, the plaintiffs are not claiming that CIGNA should change its list of criteria. Instead, the plaintiffs are merely asking that CIGNA disclose its criteria and, subsequently, adhere to them.

Significantly, CIGNA conceded during oral argument that P.A. 94-235 is not per se preempted by ERISA in that it does not directly affect plan administration and does not interfere with substantive decisions CIGNA makes with respect to structuring health benefit plans. Furthermore, at oral argument, CIGNA conceded that ERISA would not preempt a claim by the plaintiffs that CIGNA had failed to make the requisite filing with the commission pursuant to P.A. 94-235 (e) (1)[27] because such a claim would be too remote to the administration of the plan. It follows logically from this concession that the plaintiffs' claim that CIGNA failed to comply with another provision of P.A. 94-235, namely, subsection (e) (2), which provides that "[i]f a network uses criteria that [have] not been filed pursuant to subdivision (1) of this subsection to judge the quality and cost-effectiveness of a health care provider's practice under any specific program within the network, the network may not reject or terminate the provider participating in that program based upon such criteria until the provider has been informed of the criteria that his practice fails to meet," is likewise not preempted by ERISA. CIGNA argues, however, that the difference in the relief sought in the two circumstances—in the former, it is simply that CIGNA make the appropriate filing; in the latter,

---

[27] See footnote 3.

it is that CIGNA pay monetary damages for the harm suffered by the plaintiffs—dictates that ERISA preempts the claim that a provider has been improperly discharged. Because the relief in the second scenario involves the payment of monetary damages, CIGNA argues, the administration of the plan is affected. We disagree with CIGNA.

The plaintiffs are not seeking monetary damages for their claim that CIGNA violated P.A. 94-235.[28] Rather, they are seeking a declaratory judgment requiring solely that CIGNA comply with the act.[29] As we have previously

---

[28] A second reason for our conclusion is that even if the plaintiffs were seeking damages, CIGNA's argument creating a distinction between the type of relief sought is contrived. The administration of the plan is not affected in a greater way by mandating that a plan pay money damages for violating a law than by mandating that a plan make an appropriate filing according to law. In either situation, CIGNA is left "right where [it] would be in any case, with the responsibility to choose the best overall coverage for the money." *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, supra, 514 U.S. 662. Where a cause of action to enforce the filing requirements of P.A. 94-235 is admittedly not preempted, CIGNA cannot thereafter argue that just because the remedy of another type of enforcement would be monetary damages, preemption suddenly applies. See *International Paper Co.* v. *Ouellette*, 479 U.S. 481, 498 n.19, 107 S. Ct. 805, 93 L. Ed. 2d 883 (1987) ("unless there is evidence that Congress meant to 'split' a particular remedy for [preemption] purposes, it is assumed that the full cause of action under state law is available [or preempted]").

[29] In the demand for relief under their claim for an alleged violation of P.A. 94-235, the *Napoletano* plaintiffs seek a declaratory judgment determining:

"1. That Plaintiff is listed as a participating physician in [CIGNA]'s plan, filed with the Commission on Hospitals and Health Care as of October 1, 1994.

"2. That the Plaintiff has been removed from [CIGNA]'s list without being informed of the criteria Plaintiff's practice fails to meet.

"3. That [CIGNA] failed to file the general criteria for its selection or termination of health care providers pursuant to [P.A. 94-235 (e) (1) and (2)].

"4. That [CIGNA] be required to disclose its general criteria for its selection or termination of physicians pursuant to [P.A. 94-235 (e) (1)].

"5. That [CIGNA] may not reject or terminate Plaintiff due to [CIGNA]'s failure to file criteria pursuant to [P.A. 94-235 (e) (2)].

"6. Such other equitable relief as the Court deems necessary and proper."

In the demand for relief under their claim for an alleged violation of P.A. 94-235, the *Hollis* plaintiffs seek a declaratory judgment determining:

stated, by conceding that a claim that CIGNA failed to make the requisite filing under P.A. 94-235 (e) (1) would not be preempted, CIGNA has essentially conceded that ERISA does not preempt a claim under P.A. 94-235 (e) (2). Although a successful claim under P.A. 94-235 (e) (2) would in effect require that CIGNA continue to employ the plaintiff physicians, such a result would not have an impermissible or burdensome effect on the administration of the plan; see *Thiokol Corp., Morton International, Inc.* v. *Roberts*, supra, 76 F.3d 757–58; *Greenblatt* v. *Delta Plumbing & Heating Corp.*, supra, 68 F.3d 574; because it would simply enforce CIGNA's plan as CIGNA created it. CIGNA is free to establish a health benefit plan as it chooses—the plaintiffs are not seeking to require that it adopt a plan with certain features. See *NYS Health Maintenance Organization Conference* v. *Curiale*, supra, 64 F.3d 801. Upon adopting such a plan, however, P.A. 94-235, which CIGNA concedes is not per se preempted, requires that CIGNA file with the commission "the general criteria for its selection or termination of health care providers" and thereafter prohibits the use of criteria that have not been filed to terminate a provider.[30] Public Acts 1994, No. 94-235 (e) (1) and (2). Consequently, no part of the plaintiffs' claim under P.A. 94-235 relates to the administration of the plan and no part of their claim is preempted by ERISA.

"1. That Plaintiff's physician is listed as a participating physician in [CIGNA]'s plan, filed with the Commission on Hospitals and Health Care as of October 1, 1994.

"2. That the Plaintiff's physician has been removed from [CIGNA]'s list without being informed of the criteria Plaintiff's practice fails to meet.

"3. That CIGNA failed to file the general criteria for its selection or termination of health care providers under the Act.

"4. That Plaintiff's physician remain a participating physician in [CIGNA]'s plan.

"5. Such other equitable relief as the Court deems necessary and proper."

[30] We note that, even having failed to make the requisite filing, CIGNA may still discharge a plaintiff physician as long as the physician "has been

Moreover, preemption of the plaintiffs' claims would not further the purpose of ERISA preemption, which is to permit the creation of a uniform body of employee benefit law and avoid multiple regulatory schemes. *Fort Halifax Packing Co.* v. *Coyne*, supra, 482 U.S. 9–11; *Greenblatt* v. *Delta Plumbing & Heating Corp.*, supra, 68 F.3d 574; *O'Shea* v. *First Manhattan Co. Thrift Plan & Trust*, supra, 55 F.3d 113. Requiring CIGNA to enforce a plan that it has established according to law does not interfere with the adoption of uniform administrative practices.[31]

## IV

Having concluded that ERISA does not preempt the plaintiffs' claims, we must next determine whether P.A. 94-235 confers a private cause of action affording declaratory relief. The parties agree that the act does not expressly provide a private cause of action. The plaintiffs, however, claim that the availability of a private cause of action is implied. "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff one of the class for whose . . . benefit the statute was enacted . . . ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?" (Citations omitted; internal quotation marks omitted.)

informed of the criteria that his practice fails to meet." Public Acts 1994, No. 94-235 (e) (2).

[31] Because we conclude that the plaintiffs' claims in both cases are not preempted by ERISA, we need not address ERISA's savings and deemer clauses. See 29 U.S.C. § 1144 (b) (2) (A) and (B) (1994); see footnote 19. Additionally, in light of our conclusion, we need not address the plaintiffs' claims in both cases that the trial court improperly declined to open the judgments to reconsider its rulings on CIGNA's motions to strike based on the Supreme Court's decision in *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, supra, 514 U.S. 645.

*Cort* v. *Ash*, 422 U.S. 66, 78, 95 S. Ct. 2080, 45 L. Ed. 2d 26 (1975).[32]

We will examine the test as it relates to each class of plaintiffs. The act benefits the class of physician providers directly. The act benefits this class by mandating that a preferred provider network, such as that administered by CIGNA, file with the commission a list of participating physicians and a list of criteria for selecting or terminating health care providers. This filing benefits the *Napoletano* plaintiffs because they are able to determine whether they meet the criteria for selection and continued enrollment with CIGNA's health care network. Additionally, the act benefits a class of patients, such as the *Hollis* plaintiffs, by informing them which physicians are available if they take part in a particular plan and by informing them of the credentialing standards for these physicians.

Second, we do not find any indication, explicit or implicit, in the legislative history that the legislature intended either to create or to deny a private cause of action. The history is silent in this respect.

Third, providing a private cause of action to the plaintiffs is consistent with the underlying purposes of P.A. 94-235. One purpose of the act is to give health care providers information by which they can determine whether they are eligible for participation in a network. See 37 H.R. Proc., Pt. 17, 1994 Sess., p. 5951; id., p. 5956, remarks of Representative Joseph Courtney ("[w]hat this amendment seeks to do is . . . address some of the disclosure and notification problems that providers

---

[32] The Supreme Court lists a fourth factor in *Cort* v. *Ash*, supra, 422 U.S. 78, namely, whether "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" Because we are not concerned with a federal law in determining whether P.A. 94-235 provides a private cause of action, this factor does not apply to our analysis.

have . . . complained about in terms of their ability to communicate with provider organizations"). A second purpose is to provide information to the public to enable health care purchasers to make informed decisions regarding their choice of health plans and doctors. See id., p. 5980, remarks of Representative Patrick J. Flaherty ("I hope that this legislation will allow all of us to go forward and make decisions based on more complete and accurate information"); id., pp. 5981–82, remarks of Representative Christopher G. Donovan ("The consumer is not involved in the selection of the network providers as much as they could. There is no consumer report so to speak of the network providers which is given to the consumer, and I feel that if there is more consumer input in the choice of provider and more consumer input in the direction of health care, we can do better with our managed care networks in the state."). On balance, we are persuaded that, under the criteria set forth by the Supreme Court in *Cort* v. *Ash*, supra, 422 U.S. 78, a private cause of action exists under P.A. 94-235 to enforce its provisions.

Additionally, where the legislature wishes to limit enforcement of a statute to an administrative body, it has expressly done so. See, e.g., Connecticut Environmental Protection Act (General Statutes §§ 22a-5, 22a-6a and 22a-6b expressly vests enforcement power in commissioner); CUTPA (General Statutes §§ 42-110d, 42-110k, 42-110m and 42-110o delineate procedure by which commission is to enforce act). Notably, the legislature has not expressly limited authority to enforce P.A. 94-235 in the commission although it has done so in other sections of chapter 368c of the General Statutes. See, e.g., General Statutes § 19a-151 (commission has express power to regulate increased charges to patients); General Statutes § 19a-154 (commission has express authority to ensure proper application of provision regulating health care facility's transfer of owner-

ship); General Statutes § 19a-155 (commission must approve certain capital expenditures by health care agency); General Statutes § 19a-156 (commission has authority to approve, deny or modify hospital's proposed budget); General Statutes § 19a-167j (commission has authority to impose civil penalty upon health care facility that fails to file certain requested information, not including that information pursuant to P.A. 94-235). "[T]he use of different words [or the absence of repeatedly used words in the context of] the same [subject matter] must indicate a difference in legislative intention." (Internal quotation marks omitted.) *Plourde* v. *Liburdi,* 207 Conn. 412, 416, 540 A.2d 1054 (1988); see *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities,* supra, 236 Conn. 694–95. The absence of similar express limitations in P.A. 94-235 supports our conclusion that the act permits a private cause of action.

Furthermore, we discern from the legislative history that to effectuate fully the purposes of P.A. 94-235 of providing health care providers with information so that they can determine whether they are eligible to join a network and of providing the public with information about their choice of health plans and physicians so that they can make informed decisions, "private interests [would not be] amply served without private causes of action." *Antinerella* v. *Rioux,* 229 Conn. 479, 495, 642 A.2d 699 (1994). Because the act does not provide a mechanism enabling private individuals to file grievances, private persons would be denied all access to the administrative enforcement process in the absence of a private cause of action. Cf. Connecticut Environmental Protection Act (General Statutes § 22a-13 provides that council on environmental quality is empowered to receive citizen grievances alleging violation of any statute regarding environmental quality). Accordingly, we conclude that P.A. 94-235 confers a

private cause of action for declaratory relief upon the plaintiffs.

We reverse the judgments of the trial court and remand the cases to the trial court for further proceedings according to law.

In this opinion the other justices concurred.